UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MARK S. KLEEMAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:05-0034 |
| | ) | Judge Echols |
| DISASTER SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court is a Motion for Summary Judgment (Docket Entry No. 26) filed by Defendant Disaster Services, Inc. ("DSI") to which Plaintiff Mark S. Kleeman ("Kleeman") has responded in opposition (Docket Entry No. 30) and DSI has replied (Docket Entry No. 42).

### I. FACTUAL BACKGROUND

This is an action brought under the Americans With Disabilities Act ("ADA" or Act), 42 U.S.C. § 12111 et seq. Kleeman claims he was terminated in violation of the Act when he informed his employer, DSI, that he had been diagnosed with cancer. Construed in Kleeman's favor, the facts are as follows.

DSI is an emergency response company that provides predominately commercial restorative work for businesses that have experienced natural or manmade disasters. (Def. SOF ¶ 1). It employs approximately seventy individuals at its corporate

1

headquarters in Atlanta, Georgia, and some 20 others at its four branch offices. (Liebl Depo. at 14, 20). During the time period relevant to this dispute, the President of DSI was Mark Komich ("Komich"), David King ("King") was its Senior Vice President, and David Liebl ("Liebl") served as its Chief Financial Officer and head of Human Resources. (Def. SOF ¶¶ 2-3, 5, Liebl Depo. at 11).

In February of 2004, Kleeman was hired by DSI as General Manager for a new office which was going to be started in Orlando, Florida. (Def. SOF ¶ 6). Initially, Plaintiff spent time at DSI's corporate offices in Atlanta, Georgia, before relocating to Orlando in March 2004. (Id. ¶ 7). Eric McClure ("McClure"), Vice President of Emergency Services for DSI, was Plaintiff's immediate supervisor. (Id. ¶ 10).

Kleeman's job duties included contacting customers, developing new markets, increasing shares in the market, and becoming competitive in the industry. Kleeman was also required to act in a professional manner at all times. (Id. ¶¶ 8-9).

In May 2004, DSI engaged in a "marketing blitz" in which DSI sales, marketing, operation, and administrative employees traveled to Orlando to promote the opening of the Orlando office and inform potential clients of the services available to them. (Id. ¶ 12). Following the "marketing blitz," Larry Ward, the Director of Sales and Advertising for DSI, sent Kleeman an e-mail in which he discussed numerous things including the need for Kleeman and James

2

Hansen ("Hansen") (who worked for Kleeman) to follow up on the new prospects which had been generated as a result of the blitz, and to make new calls on their own. Ward also informed Kleeman that he expected Kleeman to be spending all of his time making calls on prospective customers. (Kleeman Depo. Ex. 9). Ward further instructed Kleeman to keep DSI informed about his marketing efforts. (Id.).

On June 14, 2004, Kleeman sent an e-mail to McClure which began "Atlanta strikes again" and complained about business cards which had been printed for Hansen because it took over a month to get the cards and the cell phone number on the cards was incorrect. (Pf. Depo. Ex. 12). Management at DSI considered the e-mail to be sarcastic and inappropriate. (Komich Depo. at 54).

On June 22, 2004, Plaintiff sent a second e-mail to McClure and others (including Kleeman's girlfriend who was not employed by DSI) in which he criticized the cell phones the company had purchased stating that he did not know whose "brain child" it was, but that the phones were "as useless as a sundial at nite [sic]," that given the limited free minutes it would be better to use a payphone or "Pony Express," and that the cell phones, though basically useless, would nonetheless make "'purty' paper weights." (Kleeman Depo. Ex. 13). Management regarded this e-mail as sarcastic and inappropriate as well. (Komich Dep. at 55).

3

King contacted Liebl upon receipt of the e-mail and told him that if Mr. Kleeman felt that way about DSI "they needed to fire him." Nothing was said to Kleeman about the tenor of the e-mail at that time. (Def. SOF ¶ 17 & Pf. Resp.). Plaintiff, nevertheless, admits he intended the e-mail to be sarcastic and humorous. (Id. ¶ 18 and Pf. Resp.).

Within several days following Plaintiff's June 22, 2004 e-mail, Komich, McClure and Liebl met in the latter's office to discuss various matters and, during the meeting, the trio had a short discussion about Kleeman. (Liebl Depo. 50-51). According to Liebl, Komich said that Kleeman was "not working out" and DSI should "cut him loose." (Id. at 52). McClure and Liebl agreed with the decision that Kleeman should be terminated. (Id. at 54). Prior to that time there had been some discussions about Kleeman's performance, attitude, and the lack of profitability of the Orlando branch, although there had been no discussion of termination. (Id. at 55). All three individuals who participated in the meeting testified in their depositions that the decision to terminate Kleeman was made on June 23, 24 or 25, of 2004. (Def. SOF ¶ 22).

Plaintiff was diagnosed with mouth cancer on July 1, 2004. (Def. SOF ¶ 27). On July 5, 2004, Kleeman called McClure and

4

informed him that he had been diagnosed with cancer of the mouth.[1] (Def. SOF ¶ 29).

After talking with Kleeman, McClure told Liebl about Kleeman's illness. Liebl then contacted an attorney for DSI and told him that DSI had decided to fire Kleeman, but then learned he had been diagnosed with cancer. Liebl sought advice about whether DSI could go forward. (Liebl Depo. at 137-138). Based upon the advice given by counsel, Komich told McClure to move forward with the termination. (Id.).

Prior to learning of Kleeman's cancer diagnosis, on July 2, 2004, McClure purchased an airline ticket to fly to Orlando on the morning of July 6, 2004, returning to Atlanta that afternoon. (Def. SOF ¶ 25). Although McClure had met with Kleeman in Orlando three to five times previously, McClure stated that the only reason he planned his trip for July 6, 2004, was to terminate Kleeman. (Def. SOF. ¶¶ 25-26).

The previous Friday, July 2, 2004, McClure flew to Charlotte, North Carolina, with the stated purpose of firing James Summer, the General Manager for the Charlotte office. However, the firing did not occur during that time.[2] Instead, Summer was given time to

---

[1] Kleeman has no knowledge whether or not upper management at DSI had engaged in discussions regarding the termination of his employment prior to July 5, 2004. (Def. SOF ¶ 28).

[2] Previously, in April of 2004, King was going to fire Summer because he was not out selling and told him so in March, 2004. King did not fire Summer because, in April, McClure became

5

build the residential business in the Charlotte office and, when he did not do so, he was fired in November 2004. (Schneider Depo. at 34-39).

On the day that McClure visited the Charlotte office, he told Kathy Schneider, the Office Manager, that he was flying to Orlando the next week to terminate Kleeman's employment. (Def. SOF ¶ 28). This was prior to the time that McClure learned Kleeman had been diagnosed with cancer.

On July 9, 2004, Kleeman was informed that his employment was terminated because of an inappropriate e-mail, nonconformance to management style as expected by DSI, and the fact that there had been no profits shown by the Orlando operation since its opening. (Def. SOF ¶ 22).[3] Kleeman was told of the decision by telephone because he was then in Nashville, Tennessee, undergoing further medical tests.

Although the stated reasons for termination included an inappropriate e-mail and a lack of profitability, other General Managers, such as Neil Ingram of the Chattanooga, Tennessee, branch office, had failed to turn a profit in the first few months after opening, but they were not terminated. (Ingram Depo. at 26). Additionally, at least one General Manager, Summer, had sent out a

---

responsible for the branch offices. (King. Depo. at 18-20).

[3]At the time of Kleeman's termination, not only had no profit been shown, no revenue had been generated. (Def. SOF ¶ 3).

6

scathing e-mail, but he was not terminated on the heels of sending the e-mail. (Liebl Depo. at 59).

During his time with DSI, Kleeman developed business contacts, including contacts at the Orlando International Airport for potential future restoration work. Shortly after Kleeman's termination, several hurricanes hit Florida and the Orlando office began generating revenue, including significant business with the airport. (Ingram Depo. at 22-23). The parties dispute whether Kleeman was responsible for generating the airport business as a result of his efforts prior to his termination.

During his employment, Kleeman was never given a performance evaluation by McClure, nor did McClure ever have a discussion with Kleeman about his job performance. (McClure Depo. at 88). Kleeman was never formally or informally reprimanded by his supervisor or ever told his job was in jeopardy. (Id. at 41, 52).

DSI has a progressive discipline policy proceeding from verbal warning through written warnings. (Liebl Depo. at 62). The policy was not followed in Kleeman's case since he was fired without receiving any formal warnings.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School

7

Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. LEGAL ANALYSIS

As indicated at the outset, Kleeman claims his employment with DSI was terminated in violation of the ADA. DSI has moved for summary judgment on the entirety of Kleeman's claim. Alternatively, DSI seeks summary judgment on Kleeman's claim for punitive damages.

### A. Substantive ADA Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," 42 U.S.C. § 12102(2)(A), and includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

Where, as here, there is no direct evidence to support an ADA claim, courts employ the burden-shifting paradigm of McDonnell Douglas-Burdine, with the plaintiff bearing the initial burden to establish a *prima facie* case by showing that "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment

9

decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Hedrick v. Western Care Reserve Sys., 355 F.3d 444, 453 (6th Cir. 2004). If a plaintiff establishes each of the foregoing elements, the burden of production then shifts to the employer, which must provide a legitimate, non-discriminatory explanation for its employment decision. Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 883 (6th Cir. 1996). If the employer articulates such a reason, the plaintiff then must prove "by a 'preponderance of the evidence' that the defendant's proffered reasons were not its true reasons, but were a pretext for illegal discrimination." Id. (citations omitted). In the summary judgment context, "a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." Id.

With regard to the *prima facie* case, DSI challenges Kleeman's ability to establish only the fourth element - knowledge of the employer. The crux of its position is that since the decision to terminate Plaintiff was made somewhere between June 22 and June 25, 2004, but it did not become aware of Kleeman's cancer diagnosis until July 5, 2004, it cannot be liable under the ADA.

In support of its position, DSI relies upon Potts v. National Healthcare, L.P., 961 F.Supp. 1136, 1138 (M.D. Tenn. 1996) and quotes that case for the proposition that a threshold requirement

10
Case 3:05-cv-00034   Document 54   Filed 03/07/06   Page 10 of 17 PageID #: 1547

for an ADA case requires a plaintiff to show "'that those responsible for his termination knew, at the time of the termination, of the alleged disability.'" (Docket Entry No. 28 at 13 quoting Potts, 961 F.Supp. at 1138). That language from Potts does not help DSI since the court was talking about the lack of knowledge *at the time of the termination* whereas, in this case, there was knowledge of Kleeman's condition at the time the actual termination occurred.

DSI also relies on Preibilich-Holland v. Gaylord Entertainment Company, 297 F.3d 438 (6th Cir. 2002) which, factually, is similar to the case at bar. In Preibilich, plaintiff was terminated two days after informing her employer she was pregnant. She then brought suit under the Pregnancy Discrimination Act[4] claiming her discharge occurred as a result of her pregnancy.

On appeal from the grant of summary judgment, the Sixth Circuit concluded plaintiff did not establish an essential element of her claim - that the employer had knowledge of her condition at the time the termination decision was made. Instead, the record reflected that in late September or early October 1997, plaintiff met with her supervisors to discuss her performance. They then met about a month later which resulted in a verbal warning. Id. at 441.

---

[4]Although suit was brought under this statute, the Sixth Circuit noted that, like other discrimination cases, the claim was to be analyzed under the McDonnell Douglas framework and, in fact, cited ADA law for its conclusion that plaintiff did not establish a *prima facie* case.

11

When the plaintiff's performance did not improve, her supervisors privately met and decided to terminate her employment. This decision was confirmed by a call on November 20, 1997, from her supervisor to the human resources department, wherein he asked that the termination process begin. The stated reason for the termination was "work quality" and the projected date of discharge was November 25, 1997.

On November 24, 1997, the plaintiff informed her supervisor that she was pregnant and needed time off for doctor's appointments. Two days later, the plaintiff was discharged. Id. The Sixth Circuit concluded that while there was a temporal proximity between the two events, no inference of discrimination could be drawn since there was no evidence from which a jury could conclude that the plaintiff's supervisor had any knowledge of the pregnancy when the decision to discharge her was made.

There are several similarities between this case and Preibilich, including the fact that the employer by-passed the normal disciplinary procedures, fired the employee after learning of a medical condition, and claimed that the termination decision was made before being informed of that condition. However, this Court reads Preibilich for the proposition that, when an employer definitively decides to terminate an employee without having knowledge of any medical condition at that time, its subsequent learning of the condition prior to actual termination results in no

12

basis for liability because the employee can establish no "nexus between [the condition] and the adverse employment decision." Id.

Read in this light, the facts in this case (or at least the inferences to be drawn therefrom) are sufficiently different from Preibilich so as to present a jury question about DSI's knowledge of Kleeman's condition at the time it made the definitive decision to terminate his employment. In this case, unlike Preibilich, there has been no evidence presented that Kleeman had been informed that he was on the verge of termination as a result of his performance which would permit an inference that the possibility of termination had been previously bandied about by DSI's management. Nor is there any documentary evidence to support the proposition that at some point prior to learning of Kleeman's condition a definitive decision to terminate him had been made.

Most importantly, unlike in Preibilich, there is some evidence in this case which suggests that the alleged decision to terminate Kleeman in late June 2004 was not in fact a definitive decision. After all, on July 2, 2004, McClure traveled to Charlotte with the stated purpose of firing Summer but did not do so. With such evidence, a jury could reasonably determine that, although both Kleeman and Summer were on the cusp of unemployment, the decision to terminate Kleeman only became definitive when DSI learned that he, unlike Summer, had cancer.

Given the facts of this case, the Court concludes that a jury question exists as to whether DSI actually had knowledge of Kleeman's illness when the definitive decision to fire him was made. Thus, summary judgment will not be granted on the grounds that Kleeman is unable to establish a *prima facie* case.

DSI has also moved for summary judgment on the ground that even if Kleeman can establish a *prima facie* case, it has presented legitimate reasons for his discharge which Kleeman cannot show to be pretextual. This Court finds that while DSI has articulated reasons for the discharge, whether those were in fact the real reasons for termination presents a jury question.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dew v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). While Defendant has presented some evidence suggesting Kleeman's termination came about as a result of his e-mails and "non-team" mannerisms, and the fact that the Orlando branch failed to generate any revenue, Kleeman has presented sufficient evidence to present a jury question as to whether any of those things was in fact the real reason for his discharge.

Specifically, Kleeman has presented evidence that other branch offices were not profitable during their infancy, but this did not

14

result in the firing of the General Managers of those offices. Kleeman has also presented evidence that at least one other General Manager (Summer) ran an unprofitable office and sent an unprofessional e-mail, but he was not terminated until after given a chance to improve. In fact, Summer was supposed to be fired just days before Kleeman for similar deficiencies (including the sending of an "unprofessional" e-mail) but was able to remain employed for an additional four months. While Defendant contends Summer's longevity with DSI was the reason he was given a chance to improve but Kleeman was not, a jury could just as easily determine that the real reason for the difference in treatment was that Kleeman had been diagnosed with a serious medical illness.

Moreover, Kleeman has presented evidence that as of the time of his termination he had not been subjected to any warnings about performance. Quite the contrary, although McClure visited Kleeman in Orlando on at least three to five occasions during Kleeman's short tenure, McClure never suggested that Kleeman's job was in jeopardy.

Kleeman has also presented evidence which suggests that his efforts in advancing DSI's business in Orlando resulted in large revenues for DSI shortly after his termination. While DSI attributes this to the fortuitous arrival of hurricanes in Florida, a jury could decide, for example, that Kleeman was out seeking business as expected by his employer and his efforts solidified a

15

contact with the Orlando Airport Authority which led to business for DSI.

Clearly the foregoing evidence is enough to call into question DSI's stated reasons for termination since a jury could find that the reasons have no basis in fact, were insufficient to warrant firing, or did not actually motivate Kleeman's termination, but that discovery of his medical condition did.  As such, summary judgment is not warranted on Kleeman's ADA claim.

**B.  Punitive Damages Under the ADA**

"To support a claim for punitive damages, the plaintiff must show that the employer 'engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Workman v. Frito-Lay, Inc., 165 F.3d 460, 469 (6th Cir. 1999).  "Malice" and "reckless indifference" refer to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Ass'n, 527 U.S. 526, 535 (1999). Thus, to recover punitive damages, a plaintiff must prove that "an employer . . . discriminated in the face of a perceived risk that its actions will violate federal law[.]" Id. at 536.

In this case, DSI has moved for summary judgment on Kleeman's request for punitive damages solely on the ground that it contacted counsel prior to firing Kleeman, and counsel allegedly told DSI to

16

go forward with the termination. Even accepting this chain of events, that does not perforce mean Kleeman cannot recover punitive damages. Implicit in whatever reasons DSI gave counsel for the termination is that DSI had legitimate non-discriminatory reasons for Kleeman's discharge. This Court has already found that the legitimacy of DSI's rationale for termination presents a jury issue. Accordingly, summary judgment will not be granted on the Kleeman's request for punitive damages.

## IV. CONCLUSION

On the basis of the foregoing, the Motion for Summary Judgment filed by Defendant Disaster Services, Inc. (Docket Entry No. 26) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE